We move to the next case on the calendar, which is United States v. Miller. Counsel for that case could please come forward. Katherine Kimball-Windsor Good morning, Your Honors. May it please the Court, my name is Katherine Kimball-Windsor, and I represent the appellant in this matter, Jim Miller, who is present today in court with his family. I'd like to reserve five minutes for rebuttal, and my thought was to start with the instructional error issue just briefly, and then turn to the maybe more meaty issue of the participation of an interested prosecutor in this case, but I'm happy to adjust that and to start with the second issue if the Court prefers. I'll go ahead and start with the instructional error. I think now that after Shaw, after the Supreme Court's decision in Shaw, and then its remand and this Court's decision on remand, that the correct intent instruction is that the government has to prove that the intent to defraud is the intent to deceive and cheat. And this Court has held that now in an unpublished opinion, the George case, which was a plain error case, but the Court did in that case find that... Maybe you don't know the answer to this question, because I don't think it was part of your brief or your adversary's brief, but wasn't that already the law in the great majority of circuits other than the Ninth Circuit for the last hundred years? It was. And I was thinking, Judge Rakoff, coming from New York, that this is probably quite obvious that the correct instruction should be deceive and cheat, but the Ninth Circuit had not gone, was a little bit of an outlier in that regard. And now all the circuits have been brought, or are being brought into line under that Shaw opinion. So counsel, even if we were to agree with you, what is your response to the government's harmless error argument based both on the other language in the instruction, including the definition of materiality, that is, it had an influence or capable of influencing a person to part with money or property, and the description of the wire transmissions with regard to a scheme to get somebody to part with money and, sorry to put so many which are that although your client says he intended ultimately to pay it back, that the government says that's not a defense. Exactly. The question is here, the harmless error question, because error is clear. So at that point, I do think in terms of the instructions, that intent instruction is critical. It's different from materiality. But then the bigger thing here is that this is actually... Materiality only deals with an objective question, not with intent. Similarly, the description of the scheme deals with what the scheme in the abstract was, not what the intent of your client was. The only instruction that I can see on intent is the one we've just been talking about. Yes. And Mr. Miller's defense was that he did not have the requisite intent for wire fraud. This really was absolutely the heart of his case. And he said that under the unique facts of this case, that the government couldn't prove that he had intended to deceive and cheat MWRC. And when you look at the facts of this case, he presented a lot of evidence of this. And I think the biggest thing to keep in mind is that he was holding in his hand this note for $300,000 that at any point he could hand over to the company and everybody would be made whole, which is what ultimately happened. But there are a lot of other facts as well, including that he was authorized to write checks as the president or managing member of the company, that the company had a history of making loans over $10,000. This had happened numerous times with Russ Lesser writing checks or with Jim Miller writing checks to Body Glove. The previous managing member had also written large checks to himself. There was this history of loans that were made. And also that Mr. Miller had to keep his credit perfect because he was the personal guarantor of the MWRC's credit card processing payments. And so the company was going to go under if they couldn't do that. His house was encumbered because of this pension plan. Well, I'm not sure I understand your argument fully here. If I intentionally, by use of deceit, obtain without permission your money and property, commonly called embezzlement, the fact that, oh, I intend ultimately to pay it back is not a defense, is it? It's going to depend on the intent of that person in the particular case and whether they intended to do harm to the company, which is what that and cheat encompasses. I mean, I understand that's your argument, but I kind of don't understand how that doesn't violate the statute, even if it were totally believed. If you do what your client is alleged to have done, even with his defense, I don't see that doesn't violate the statute. Because the government has to prove the intent to deceive and cheat, and so that he was going to, that he intended to do harm to the company. And his defense here, we're not, I'm not arguing sufficiency, I'm just saying that this should have been put before the jury under the unusual facts of this case, given all of those factors that he was trying to keep the company going. And he made those decisions in light of all of, you know, all of these factors. Just to go back to the hypothetical, sorry, it follows from your argument that if I embezzle money from my company to invest in a gold mine in Timbuktu that I feel absolutely sure will be a great investment, but of course it turns out that it's a worthless gold mine, you're saying that that's still a complete defense to wire fraud, because at the time, since I thought the gold mine was a good investment, there would be no harm ultimately to the company. Is that your position? And I'd quibble with the word embezzlement, because it was, you know, an investment perhaps that you, if you intended not to do harm to the company, then you, that would be a defense to the crime. Show me a case that says that. That says that your belief that it will all turn out well in the end, which I think might characterize 99% of the con men in the country, is a defense. I don't, I mean, what the case I have is Shaw, which says that the government has to prove the intent to deceive and cheat. And this is a, this sort of thing. Right, but the question is what's meant by cheat. Yes. And you seem to think it means more than just to intentionally obtain money and property by means of deceit. That it also means that you have to have an intent to not just harm the company immediately, but an intent not to harm the company ultimately. And I don't know any case that goes that far. Well, I, what I'm saying is that cheat, if we define cheat as the intent to deprive the victim of something of value and cause harm. Yeah, that's why, I mean, I agree with you. I want to hear from the government. I agree with you that there's a big difference between deceit and cheat, and you need both. Right. But what I don't understand is why you think that a good faith belief that it'll all turn out all right in the end is a defense. Well, perhaps then that's not the intent to deceive and cheat. I'm talking about in this case what the evidence showed and what Mr. Miller's, really the heart of his defense. I mean, and the government got up and said he's, he got up on the stand and confessed to all the elements of the crime because this is not a defense that he, all we have to show is that he didn't, that he intended to deceive the company. And so we're saying that under the facts of this case, this should have been given to the jury to decide that question. So if the jury, your view is if the jury, under the correct instruction, if the jury believed your client that he intended ultimately to put the money back, that that's a defense? Well, it's more complicated than that here because really he was, his intent was, I mean, what his defense was that he had no intent to harm the company, that he could at any moment, you know, this was moving money around and that he had to keep his credit perfect or the company was going to go under. So it was a much worse harm to miss a payment. And we're saying that that should have been put to the jury. I guess at least tentatively, I'm where Judge Rakoff's question was, which is, I just don't see how that's a defense under the statute or a case that holds that. But, but I know you had other things you wanted to talk about. Why don't I turn to the second issue? And I just, what I'd like to start by doing is just by acknowledging that this was a highly emotional situation. This was a company involving two best friends who'd been friends for decades. Their families were friends. They were prominent people in the community. The story was covered by the local newspapers as something that was dividing the community. And they went into business together and things blew up and the friendship was destroyed. And they both felt that they'd been bending over backward for each other. And there was a huge sense of betrayal. And at the end, everything, their family was made whole. So there was no loss in this case. And this is a familiar tale except that at the end of this case, we have a criminal prosecution. And the question that has, is haunting the Millers and their community is why was this case where there was no loss, why was this case prosecuted? And the problem is, is that the son of Russell Lesser was an assistant United States attorney in the central district office. And he was the one who reported the case to the FBI, to a friend of his. And then for the next 22 days during which all of the investigation was done in this case, when there was a wiretap or a wired confrontation that happened, a interview by the FBI, during that entire time, the FBI found that the conflict of interest was not reported to the prosecutor's office. It was at the end of that 22 days that it was finally reported. And given that scenario, we have a clear appearance of impropriety. But counsel, is it your position that that bad conduct, that that permanently barred the United States from prosecuting your client? Because of the involvement during that, that the reporting of it and all of the investigatory phases, yes. But at that point, the case could not be prosecuted. Under the Young case, which says when we look at this prosecutorial function, we look at the entire length of the case. And really the Young case focuses on that investigative stage in particular. So, I mean, you would ask us to create a circumstance that says this activity, which doesn't affect really the underlying facts of what went on, is something that whatever the motive was, bad, good, whatever, it doesn't matter. This is the end of the case. The United States, the judicial branch tells the executive branch you can never, ever prosecute this case. Yes, because once you have that violation of 18 U.S.C. section 208, which is whether once the federal prosecutor has participated personally and substantially in a matter in which he has an interest, and that this court has defined that term very broadly. But do you have to go that far? I mean, I thought your argument was that looking at the reported cases, it's very rare that the wire fraud statute is invoked when there's no loss. And in those few cases where there is a loss, where there is no loss, it's usually because the fraud was caught at the outset, so there wasn't time for there to be a loss. And so your argument is the improper reporting of this and the solicitation of the FBI by the sun caused this case to be given greater attention than it would have been if it just been reported by someone outside. The thing that Young says, though, is that it doesn't even, it doesn't even matter that, you know, we don't decide if there actually was impropriety. It's that appearance of impropriety. It's that distrust. Young is a very different kind of case, is it not? It's, I mean, the difference is that it was a contempt of court case and that the... My recollection of Young is that it was a commercial counterfeiting case and the counterfeiters had repeated, had violated the court's injunction and so Judge Lasker of a place you may not have heard of called the Southern District of New York appointed plaintiff's counsel to be the prosecutor on the theory that he already knew the whole case. So it was a matter of efficiency and the Supreme Court ultimately said, no, you can't do that because it's mixing two different roles and depriving the system of the objectiveness that a prosecutor who wasn't, didn't have a motive would bring to the case. I'm not saying it's irrelevant, but it does seem to be a very different context, yes? Well, we don't have very many cases actually involving interested prosecutors. I mean, it's, I mean to me it was fairly astonishing that there's these, a couple in the, this set of companion cases I think out of the 11th Circuit where there wasn't much involvement really at all or the conflict was certainly much less. Here we have such a clear conflict. And in this case that it continued past, you know, past that there was still participation in the investigation even after the period of indictment. I'm not saying there was contact with the prosecutor in the Southern District, but that there was, you know, that Mr. Lesser was continuing to investigate Mr. Miller's employment in, with the SEC and this prior civil case and was passing along advice about how to get the case to plead. That participation continued. And so it is more than just that, those initial 22 days, although I think that's quite significant. And I, I know. Weren't his conversations primarily with his father? He had conversations with his father. He also emailed, this is what we have, what was turned over. There were also emails with colleagues to find out about the SEC. And then he did some research trying to find out about this prior civil case and what had happened with it. And that continued for quite some time because there was some confusion about how it had ended. You're over, but I have one question and this is an important case. We'll certainly give you adequate time. I just have one question about your theory as to why prosecution altogether was barred. I don't understand why the recusal of the Central District Office, the shift of all charging authority to the Southern District Office doesn't cure whatever appearance might have occurred. Because I agree with you. I certainly was surprised that this case went forward. It doesn't seem like something that would warrant the attention of the federal government. But nonetheless, whatever taint occurred in terms of the initial interest in pursuing the case as a result of the Central District's involvement, why wasn't that cured by having a totally independent office, which presumably has no, doesn't know any of these people, doesn't really care about any of them, make an independent judgment as to whether this warranted prosecution? Yeah. Well, I would say two things. I mean, one, even though I agree that Young is not, you know, exactly the same scenario. But Young does talk about that the important thing is to think about that array of coercive methods to obtain information in investigation. It talks about wiretapping. All that stuff that happened before the case, before the case was sent to the Southern District. You know, whether an investigation even would have happened or would have gone, would have proceeded in this way. And that the Young case says that once we have that taint and that concern that diminishes faith in the fairness of the criminal justice system, that at that point we have structural error. And also, Young also says that having, you know, the argument in Young was, well, there was a district court judge there who was a neutral authority. And I know, you know, it's not exactly the same, but the court there said, you know, that doesn't even cure it to have a neutral party that's overseeing the court. Yeah. And obviously if the Central District's Office had remained the prosecuting authority throughout, I think you would have something to say there. But you had a completely untainted office. I just don't think it's fair to lump the federal government, you know, the Department of Justice as just one big entity. Right. No, and I don't, you know, and we, I certainly don't think that there was, I absolutely, we accept the Southern District, their statements that they did not have any contact with Mr. Lesser. But the case was handed to them in this position after all of the investigation had been done. But your theory is that this case was so unworthy of federal prosecution that had it not been for the interested prosecutor on the charging end, getting things going, that nobody would have bothered with this. And I guess I just don't find that persuasive when it was handed to prosecutors who had no interest in this, in having this go forward, and they nonetheless decided to charge it. Yeah. I mean, I find it very curious that this case went forward. I have not seen a case like this prosecuted, honestly. And I just think, you know, given the, given this odd scenario, I, you know, I don't have any other way to explain it, why it was pursued. Because I don't see cases like this with absolutely no loss. No loss that, where, you know, it was all made good before Mr. Miller even knew that the federal government was involved in it. I don't have an answer for why it was prosecuted. And I think that's partly, that's the question that's hanging over this case, and that continues to hang over it, is why. Okay. Thank you. We'll give you a couple minutes for rebuttal. Let's hear from the government. Thank you, Your Honors, and good morning. I can't address the question of why this case was prosecuted, because I'm the one who made the decision to prosecute it. I recognize that a case of this size may seem small compared to New York or Los Angeles, but in San Diego in the Southern District of California, this case involving about a quarter of a million dollars of intended loss on top of the tax loss is a decent little case, where it comes to me with the, without all of the, excuse me, the knowledge that we have now. You're saying that if someone steals a quarter million dollars, and then when they get caught out on it, they pay it back, that's, they still committed an obvious crime that might well be worth prosecuting for both its own terms and for its deterrent value. Yes, Your Honor, particularly where, as here, there's also a tax consequence. And I would take issue with the characterization that this case was fully investigated before it came to the U.S. Attorney's Office in the Southern District of California. That's not at all the case. Among the many things that I did, not to be egotistical about it, but no grand jury subpoenas were issued until I got involved. There was no tax case until I referred it to IRSCI. The tranches of documents that we obtained and reviewed in connection with that, all of that happened later. Very little, relatively speaking, actually, very little investigation took place prior to the refusal happening. And Counsel, I presume, although you would say it very politely, the government's view is that essentially, except in the most limited circumstances, this is an Executive Department decision, not a Judicial Branch decision. That's exactly right. And whether it's a wise one or not can be debated, but it is a decision of the Executive Branch, and it's one that in the Southern District we make routinely. And I would disagree that this is a no-loss case. For one thing, the intended loss, which was correctly used to calculate the sentencing guidelines, which have not been challenged, the sentencing guidelines for loss was over a quarter million dollars, not even counting the tax loss. And while I would agree that on a restitution side for the embezzlement, there was no restitution order, so there was no restitution loss on the embezzlement, there was on the tax loss, and that restitution order is still outstanding. So it was a case that did involve loss. This is a, I mean, I hear what you're saying. I guess I just don't find it very believable. Not believable, that's the wrong word. It's just not compelling because this is really a dispute between two longtime friends, and they worked things out. It got worked out between them. Granted, the IRS had an interest, possibly, but what drove this initially at least was the embezzlement angle, and that just, I don't, even in San Diego, I can't imagine that this is, you know, you don't have better cases to focus the federal government's limited resources on. Well, Your Honor, oh, sorry. Given the resources this case has now required, we could Monday morning quarterback, and I might agree with Your Honor that the investment of resources that ultimately went into the case perhaps outweighed the overall harm, the deterrent effect, but those were not the facts we were presented at the point in time in which I was developing the case, working on it, assessing whether there was a tax loss, trying, as we always do to work out something pre-indictment, and ultimately, this is where we ended up. So while we can Monday morning quarterback the wisdom of undertaking a case of this size in light of what the investment of resources required, that's, again, not the role of this Court. It's not even the role of the District Court. Can I ask this question? Let's put aside the issue as to whether the prosecution would be barred altogether, at least on the record we have now. I guess I'm a little troubled that the District Court didn't at least conduct a limited evidentiary hearing at which we could have heard from AUSA Lesser and, you know, perhaps maybe some of the agents that he worked with. I guess I'd like to just hear your response to it, because part of the argument is that there should have been an evidentiary hearing at least so that we could get the full story and not have to rely on your representation to us and to the District Court, that I had no contact with the guy and he had no influence on the course of the investigation after the recusal occurred. Yes, Your Honor. An evidentiary hearing in this case would not have resulted in any different outcome. For one thing, taking the possibility of AUSA Lesser, who I did not speak to in producing the discovery, in trying to answer the defendant's discovery questions, the Court, I'm sure, has reviewed the letter that I wrote. It's in the Excerpt of Record, pages 804-806, that details my attempts to confirm with Agents Bonin, Mason, and Swanson the full extent of any contacts that weren't already documented in the FBI 302s or the FBI ECs. So that was the starting point, is they, of course, document the vast majority of their contacts in those forms. But I wanted to be exhaustive and get everything else, so we got the emails and we also, I just talked to them and I summarized those findings in a letter. I did not talk to AUSA Lesser. To the extent the accusation is that he engaged in criminal conduct, I mean query whether he would have been entitled to invoke the Fifth Amendment right at such an evidentiary hearing, so I don't know that we would have gotten the kind of information that they would have liked to have received. And the record as it stands now shows that there just weren't, from the emails, from all the communications with the FBI, AUSA Lesser did not direct them in the two small investigative steps that they took prior to the conflict. Yes, he refuted for the case and that... I'm not talking about the pre-recusal period. I'm talking about afterwards. I mean, let's assume that we were to accept your argument that whatever taint existed in that 22 days was purged by the recusal and your office coming in and taking a fresh independent look, all that. It would be more concerning, however, wouldn't you agree, that if AUSA Lesser in fact, not directly with you, but had continued to play some kind of a role in the, as the case moved forward, I think that would be of concern. And the district court, it seemed to me, never really got conclusively to the bottom of that question. And I believe that that's because the district court assessed correctly that whatever AUSA Lesser was doing in his office with contacting friends at the SEC, drafting comments for the press, was irrelevant. None of it made it to touch on the prosecution. He could have been drafting a closing argument for trial, for all I know. It doesn't matter. He had no contact with the prosecution team, with myself or Agent Swanson, so there was nothing that he was doing was material in any way to the decisions we made on how to proceed with the case, what to charge, what to recommend for sentencing, or anything. So to some extent, again, whether it's ill-advised is a different question, whether it's criminal is a different question, but whatever he is doing in his own office or with his own colleagues that doesn't touch on us did not affect the defendant's rights and did not cause any prejudice to the defendant because there was a neutral prosecutor. This is different from Young. Young, the point that the court made in Young is that the prosecutor is endowed with so many powers and it lists all kinds of wiretaps and all sorts of investigative steps that a prosecutor can decide to take. The lawyer in Young was simultaneously being paid by the victim at the time he carried out the prosecution. I mean, a vastly extreme situation compared to this. But I wonder if we could turn at some point, I don't mean to interrupt, to the charge. Are you seriously maintaining that it should be deceit or error and that is a correct statement of the law? I am maintaining that this court has consistently held for decades and reaffirmed it in Treadwell despite being challenged on the intent instruction that that's a proper instruction. So let me make sure I understand. So because the statute, of course, talks about that the a scheme or artifice to defraud and a common law and when the statute was, the mail fraud statute, which was the predecessor of the wire fraud statute, was adopted in 1872, it adopted the common law view of the intent, which had always been more than just telling a lie. But your position is that it's still good Ninth Circuit law, despite Shaw, despite all that history, despite, frankly, the views of every other circuit or at least those I'm familiar with, that if I go to, I'm a salesperson and I want to gain entry to the boss of a company, I can sell him my wares. The secretary says he's very busy. Who are you? And I lie and I say, oh, I'm a close personal friend. And she says, okay, that's good enough. I'll let you go see the boss. And then without any fraud whatsoever, I sell the boss my wares and he's very happy and all like that. But I use that lie to get in the door and you're saying that that is a scheme to defraud punishable under the wire fraud statute? Well, you hit on it exactly. There was a scheme to defraud. In this case, all they're challenging is the intent instruction. That's only one of the four elements that the jury was instructed on. They were still instructed that there had to be a scheme to defraud and it had to be material. And then there's also, of course, the intent requirement. But mail fraud is typically distinguished in virtually every treatise, not that that's binding on the courts, as a, quote, specific intent crime. And what is meant by that is you have to have a specific intent to defraud. You're not just telling a lie here or there, which in this cold, cruel world of commercial activity, sometimes people do. You have to have an intent to obtain money or property by means of false or fraudulent pretenses, representations, or promises. But that's not what this instruction says. It says, yeah, you tell, if you intentionally tell a lie in the course of what turns out to be a scheme, too bad, off you go to jail. Well, this court did require that there be an intent to defraud. It said that. It just in the context of this case, your honor, it's very clear that the outcome would not have been the same. I understand the harmless error. I think the harmless error argument is a substantial one. But I'm surprised the government, even in this late day and age, was this the charge you submitted to the, or is it simply the pattern instruction that hasn't been changed? How did this come about? We submitted the pattern instruction. It's the same pattern instruction. And I double checked it yesterday. I'm not sure if I can say it's in the record. But it doesn't look like it's changed since even then. Not even in San Diego? Well, that is the nice thing in the Ninth Circuit about the pattern instructions, is we can go to them and they are consistent across all the districts. And it does not, the defense really makes, I'm sorry, the appellant makes too much of Shaw. Neither the Supreme Court nor the Ninth Circuit on remand in Shaw actually held, even in the context of the bank fraud statute, that that instruction was erroneous. And, of course, we're not dealing with the bank fraud statute. So I come back to the fact that this Circuit's law has consistently been that the model instruction 8.124, it used to have a different number, but it's now 8.124, deceive or cheat is a proper definition of intent to defraud. And in the Treadwell case, explored pretty thoroughly the competing cases from other circuits and other districts. And the Ninth Circuit did explore those and determined that the jury instruction used in that case, which is the same one used in this case, the model instruction, was consistent with the requirement to prove intent to defraud. You know, this Court can disagree whether those other cases were adequately distinguished, but that was nonetheless explored in Treadwell, and that was the clear express holding. I see that I'm almost out of time, so I do want to make sure I've addressed any the harmless error, if I may briefly turn to that. Ultimately, it's significant that even if the court, the jury, had been instructed that the requirement to meet the intent to defraud element was an intent to deceive and to cheat, suggesting something more than just lying. Here, it's very clear there was an abundance of evidence that the defendant intended to cause at least a temporary financial harm by depriving the company of money. He received checks into his personal account and all the lies he told, falsifying the checkbook to say that checks had been transfers to another bank instead of to himself, falsifying the account statements when he met with Ress Lester to go over the accounting, and lying to Ress Lester. All of those things showed that he was intending to deprive it of money. I also think it's worth noting that in the jury instructions, for purposes of the tax count, the jury was instructed that a loan is not income. To the extent the jury had credited the defendant's claims that this was just a temporary loan, this was very common at the company, they could not have convicted on the tax count, which they did. So we know that the jury rejected the defendant's testimony in his own characterization of this as merely a loan, something he intended to repay. So the evidence in this case just doesn't support his own spin that he wanted the jury to believe in. It was rejected and would have been rejected had they been instructed intent to deceive or cheat. Thank you, Your Honors. You may have to end, but okay. Yes, thank you. No, that's okay. Thank you very much for your argument. Let's put two minutes on the clock for rebuttal. I just wanted to start by addressing the issue of the evidentiary hearing and the question of discovery, because as Judge Bennett, you were asking about how AUSA Lester was communicating or continued to be involved. And I think it's true that he was mostly, he was communicating with his colleagues and he was communicating through his father, but it was certainly filtering through to the FBI agent. And there is that additional allegation of misconduct against the FBI agent as well. But the question of the Lindstrom matter, that continued to be floated or continued to be a question in the prosecution. There was also that he had spoken to Mr. Miller's first attorney about his statements to the FBI, and that was passed along through the agent. And because we didn't have any sort of evidentiary hearing or even that AUSA Lester wrote in his emails, I don't want to communicate on my official email. I want to communicate on this private email. And the response to one of his correspondence was, well, that's still going to be public record. And he said, I know that, but that's how I want to communicate. None of that was turned over and the government's position has been that they don't possess it. But what we're asking for this and for the other discovery issues is just that the government try to get this and take a look at it. We're not asking that text messages and emails be turned over to the press. We're just asking the government to look at them and see if there's Brady in them to see what that is. So you're asking us to send it back and order the government to look at it as opposed to the government making a decision in the exercise of prosecutorial discretion that that would be something that it ought to do? Yes. I'm asking, I'm saying that this is an appropriate case for the exercise of the court's supervisory powers, which I understand is a serious thing. But there is also this serious allegation that that does lead us to question the integrity of this decision. Is Mr. Lester, the younger, still in AUSA? I believe that he is, yes. Does the court have any other questions about the discovery or any other topic? No. I think we've got the arguments. Thank you very much for the helpful arguments in this case. The case just argued is submitted.
judges: Watford, Rakoff, Bennett